# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

---

JALIN REALTY CAPITAL ADVISORS, LLC,

                      Plaintiff,

   v.

A BETTER WIRELESS, NISP, LLC,

      Defendant/Counterclaim Plaintiff,

   v.

RHYTHM STONE MEDIA GROUP, LLC, d/b/a Jalin Realty Capital Advisors, LLC,

         Counterclaim Defendant.

Civil No. 11-165 (JRT/LIB)

**MEMORANDUM OPINION AND ORDER ON DEFENDANT/COUNTERCLAIM PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

Andrew Ndubisi Ucheomumu, **LAW OFFICES OF ANDREW NDUBISI UCHEOMUMU**, 4938 Hampden Lane, Suite 133, Bethesda, MD 20814; and Kristi A. Hastings, **PEMBERTON SORLIE RUFER & KERSHNER**, P.O. Box 866, Fergus Falls, MN 56538-0866, for plaintiff/counterclaim defendant.

Michael M. Lafeber and Erin O. Dungan, **BRIGGS & MORGAN, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for defendant/counterclaim plaintiff.

A Better Wireless, NISP, LLC ("ABW") sought a loan from Rhythm Stone Media Group, LLC, d/b/a Jalin Realty Capital Advisors, LLC ("Jalin") and the parties entered into an agreement under which Jalin would attempt to fund the loan in exchange for a $37,500 commitment fee.  After Jalin did not fund the loan and did not refund the

commitment fee, ABW created a website with the domain name "jrca.info" and used the website to warn other consumers about what it perceived to be Jalin's fraudulent business practices. These postings are the basis of Jalin's numerous claims against ABW, which include cybersquatting, trademark infringement, trade dress infringement, deceptive trade practices, appropriation of personal name and likeness, intentional interference with economic relations, and defamation. ABW brought counterclaims against Jalin alleging breach of contract, fraud, RICO violations, conversion, and unjust enrichment. ABW now moves for summary judgment on all of Jalin's claims against it, as well as on its counterclaims for breach of contract and fraud.

The Court will grant ABW's motion with respect to all of Jalin's claims, which are variously unsupported, insufficiently pled, and entirely without merit. The Court will also grant ABW's motion with respect to its breach of contract counterclaim. However, the Court will deny ABW's motion with respect to its fraud counterclaim.

## BACKGROUND

### I.  THE PARTIES

ABW is a Minnesota company with a mission to bring affordable, high quality broadband service to rural areas of Minnesota. (First Decl. of Mitchell Duane Koep ¶ 2, May 30, 2012, Docket No. 80.) Jalin holds itself out as a "boutique hard money lender for commercial Real Estate." (*Id.* ¶ 3 & Ex. B.) Jalin's website states that the company was established in 2006 (*id.*, Ex. B) and Jalin's complaint states that it was established in 2008 and incorporated in Ohio in 2009. (Compl. ¶¶ 12-13, Jan. 21, 2011, Docket No. 1.) In fact, "Jalin Realty Capital Advisors LLC" was registered as a trade name of Rhythm

Stone Media Group, LLC ("Rhythm") in September 2009 in Ohio (as opposed to being "incorporated" as an independent company).[1]  (Decl. of Kathryn M. McDonald, Ex. A, June 17, 2011, Docket No. 29.)  The trade name was cancelled in April 2011.  (*Id.*)  Jalin has since been dissolved and its owner is in bankruptcy in Ohio.  (Aff. of C. David Manns ¶ 20, June 20, 2012, Docket No. 83.)  ABW alleges that Jalin's address is now vacant and its phones are disconnected.  (First Koep Decl. ¶ 13.)

## II.   JALIN'S DISCOVERY VIOLATIONS

The factual record before the Court is quite sparse, due in large part to the conduct of Jalin's counsel during discovery.  ABW served a set of interrogatories and requests for production of documents on August 19, 2011, and a second set of requests on August 23, 2011.  (Decl. of Erin O. Dungan, Ex. B-C., Jan. 12, 2012, Doc. No. 56.)  Jalin did not respond within 30 days, in violation of Fed. R. Civ. P. 33(b)(2) and 34(b)(2)(A).  (*Id.*, Ex. D.)  Jalin responded on October 10, 2011, but did not produce a single document and provided almost no information in response to the interrogatories.  (*Id.*, Ex. G.)  Jalin repeatedly objected to ABW's interrogatories as "incomprehensible as drafted" and

---

[1]  Jalin moved to dismiss ABW's answer and counterclaims, which correctly listed Rhythm Stone Media Group, LLC, d/b/a Jalin Realty Capital Advisors as counterclaim defendant, alleging that ABW was adding a new party and that Rhythm was not subject to personal jurisdiction in Minnesota.  The Court held that "[n]o personal jurisdiction issue exists. Jalin's counsel conceded at oral argument that Jalin is merely a trade name registered by Rhythm.  ABW has therefore not added another defendant, but rather corrected Jalin's failure to note the real party in interest in its complaint."  *See Jalin Realty Capital Advisors, LLC v. A Better Wireless, NISP, LLC*, Civil No. 11–0165, 2012 WL 838439, at *4 (D. Minn. Mar. 12, 2012).

"overly broad," claimed that its complaint contained the information requested, and referred ABW to Jalin's website to find information. (*Id.*)

ABW moved for sanctions and United States Magistrate Judge Leo I. Brisbois granted the motion. (Order, Feb. 22, 2012, Docket No. 60.) The Magistrate Judge chastised Jalin for its uncooperative and improper behavior as follows:

> [L]ooking at all of [Jalin]'s discovery responses, [Jalin] provides almost no relevant information useful to [ABW] to defend against [Jalin]'s claim. [Jalin] continually directs [ABW] to its website for information as if [ABW] should be required to search on [Jalin]'s website to find information that supports [Jalin]'s case or speculate as to the factual basis for [Jalin]'s claim. The type of objections provided by [Jalin] not only disrespect the judicial process, but such objections thwart discovery's purpose of providing both parties with information essential to the proper litigation of all relevant facts, to eliminate surprise, and to promote settlement. . . .
>
> . . . .
>
> . . . [C]ombined with [Jalin]'s late responses to discovery, late submission of a verification of discovery responses . . . by a corporate representative, and failure to even appear at the present motion hearing, suggests that [Jalin]'s discovery responses were formulated for an improper purpose and intended to delay and harass [ABW].

(*Id.* at 9-10 (internal quotation marks omitted).) The Magistrate Judge ordered Jalin's counsel to personally pay $1,610 in attorneys' fees to ABW. (*Id.* at 13.) More importantly, the Magistrate Judge concluded that "more than mere monetary sanctions are necessary" and ordered "that in any subsequent judicial proceeding regarding this matter, the Plaintiff cannot rely on or offer into evidence any information, documents, or other materials which were not provided in response to the Defendant's original sets of discovery requests." (*Id.* at 11.)

The Court was not asked to review the Magistrate Judge's strong sanction and, in any event, believes that it was appropriate. The Court will note the ways in which the sanction impacts the analysis throughout this opinion.

## III.    THE LOAN AGREEMENT

The seeds of this action were planted when ABW sought financing from Jalin and the two entered into a Loan Commitment Agreement on July 29, 2010. (First Koep Decl. ¶¶ 4, 6.) The Agreement embodied Jalin's "commitment to provide financing," (*id.*, Ex. A at 1), and stated that Jalin "intends to bring co-lenders to facilitate this loan" and would "manage all aspects of the co-lending." (*Id.*, Ex. A at 5.) The Agreement required ABW to pay a "commitment fee" of $37,500 for "processing, underwriting, and due diligence." (*Id.*, Ex. A at 2.) The Agreement stated that ABW was "entitled to a refund less any cost incurred if [Jalin] does not fund a loan under [the] terms stated." (*Id.*, Ex. A at 3.) More specifically, the Agreement provided that "[i]f [Jalin] is unable to bring co-lenders into the transaction, or if [Jalin] does not perform its obligations under the terms of this commitment for whatever reason, [Jalin] shall only be obligated to refund the paid portion of the commitment fee." (*Id.*, Ex. A at 5.) Pursuant to the Agreement, ABW's commitment fee was paid by another entity, Ride Ocean Zoom, Inc., (*id.*, Ex A at 2.), which apparently also sought financing from Jalin. ABW's attorney asserted at oral argument that ABW still owes Ride Ocean Zoom $37,500, though there is no litigation presently underway.

ABW alleges that the Commitment Agreement was fraudulent, that Jalin never attempted to comply with the Agreement, and that its representatives did not even possess

licenses that were required to provide the loan.  (First Koep Decl. ¶¶ 9-10, 12.)

According to ABW, Jalin has failed to refund the commitment fee despite multiple

requests.  (*Id.* ¶ 11.)  ABW also asserts that Jalin's agents are engaging in an almost

identical fraudulent enterprise in Pennsylvania under the name American Capital

Holdings, LLC.[2]  (*Id.* ¶ 14.)

## IV.    ABW'S WEBSITE

The present action arose because ABW created a website with the domain name

"jrca.info" and used the website to warn others about what it perceived to be Jalin's

nefarious business practices.  While ABW believes the website was a legitimate exercise

of its First Amendment rights, Jalin alleges that ABW engaged in a "campaign to

discredit [Jalin] and hurt[] its business" by "populating the Internet with false and

malicious information."  (Compl. ¶¶ 36-37.)  Throughout its complaint, Jalin refers to the

"derogatory" and "defamatory" information ABW posted on its website, but Jalin does

not provide more specific information about the content of ABW's website.  (*See, e.g.*, *id.*

¶¶ 3, 21, 36, 39, 40, 42, 46)  Jalin's complaint asserts a number of claims, including

cybersquatting, trademark and trade dress infringement, and defamation.  ABW denied

Jalin's claims and asserted counterclaims for breach of contract and fraud, among other

---

[2] In an interrogatory, ABW asked Jalin to "[i]dentify the relationship and/or involvement of you or any of your officers, employees or agents with 'American Capital Holdings, LLC' apparently based in Pittsburgh, PA" and Jalin responded that "upon information and belief, no current officer, employee or agents of [Jalin] is involved with the American Capital Holdings, LLC."  (Dungan Decl., Ex. G at 46.)  However, Jalin's representative now acknowledges that he and another Jalin employee "went to work for American Capital Holdings, LLC" after Jalin was "forced to close."  (Manns Aff. ¶ 13.)  It appears that Jalin's interrogatory response was made in bad faith.

counterclaims.[3] The Court will address all of the parties' claims and allegations, and the evidence that relates to those allegations, in greater detail, below.

## V. JALIN'S UNTIMELY AND BARRED VERSION OF THE FACTS

In a declaration in opposition to ABW's summary judgment motion, Jalin's representative sets forth a much different version of the facts than those that appeared in Jalin's complaint and discovery responses. In the complaint, Jalin asserted that "[u]pon information and belief, Defendant ABW never sent any loan application fee directly to [Jalin]." (Compl. ¶ 19.) Jalin then claimed that "[u]pon information and belief, after evaluating . . . ABW's loan application, the executives of [Jalin] made a business decision not to loan money to ABW."[4] (Compl. ¶ 20.)

In its declaration, on the other hand, Jalin acknowledges that it received $37,500 from Ride Ocean Zoom on behalf of ABW. (Manns Decl. ¶ 8.) This method of payment was outlined in the written Commitment Agreement. While the declaration is technically consistent with the allegation in the complaint that **ABW** never sent a fee **directly** to

---

[3] Jalin did not file an answer to ABW's counterclaims. After the Magistrate Judge granted Jalin's three requests to extend the deadline (*see* Docket Nos. 11, 15, 16), Jalin moved to dismiss ABW's counterclaims on a number of grounds that were each rejected by this Court. *See Jalin Realty Capital Advisors*, 2012 WL 838439, at \*3 ("Jalin's theories of dismissal are variously opaque and patently without merit."). The Court also warned Jalin's counsel that one of its arguments violated Fed. R. Civ. P. 11(b)(2) because it lacked factual support. *See id.* at \*4 ("Rooting a motion to dismiss for lack of personal jurisdiction in facts that counsel conceded at oral argument to be false – namely that Rhythm and Jalin are distinct corporate entities – is not acceptable under Rule 11.").

[4] Similarly, in response to an interrogatory asking what tasks Jalin had undertaken that entitled it to retain the commitment fee, Jalin simply stated that ABW "applied for a loan which was later not approved." (Dungan Decl., Ex. G at 48.)

Jalin (because Ride Ocean Zoom paid on ABW's behalf), the complaint appears highly misleading for failing to refer to Ride Ocean Zoom's role in the transaction.

The declaration goes on to assert that another entity that did not appear in the Commitment Agreement, the complaint, or any of the discovery responses or disclosures played a crucial role in the transaction. Jalin claims that it was concerned because ABW had no collateral to offer and that the parties therefore solicited the services of Brightway Financial Group, LLC, ("Brightway"), an entity that allegedly leases letters of credit that can be used as collateral. (*Id.* ¶ 5.) Jalin asserts that Ride Ocean Zoom provided payment of the commitment fee with the instruction to forward the fee to Brightway, and that ABW knew this was the arrangement. (*Id.* ¶¶ 8-10.) Jalin then makes a vague reference to Brightway's failure to perform and seemingly suggests that Jalin is not liable for returning the commitment fee because it forwarded the money to Brightway and Brightway reneged on its obligations.[5] (*Id.* ¶¶ 11, 16-17.)

There are a host of problems with Jalin's attempt to rely on Brightway's purported role in the parties' transaction. First, the Magistrate Judge's discovery sanction prohibits Jalin from relying on information that was not provided in response to ABW's interrogatories and requests. Second, Jalin made no reference to Brightway or any Brightway employee in its Rule 26(a)(1) initial disclosures,[6] which are supposed to

---

[5] Jalin also provides a complaint from an action that American Capital Holdings filed against Brightway in the Northern District of Texas alleging that Brightway defrauded it. (Manns. Decl., Ex. B.)

[6] (*See* Dungan Decl., Ex. L.)

include the name and address of each individual "likely to have discoverable information – along with the subjects of that information."[7]  Fed. R. Civ. P. 26(a)(1)(A)(i).  Third, even if the Court overlooked the first two problems and considered the evidence, Jalin has not explained why Brightway's alleged failings free Jalin from its obligations under the Commitment Agreement.  Again, the Agreement provides that "if [Jalin] does not perform its obligations under the terms of this commitment **for whatever reason**, [Jalin] shall only be obligated to refund the paid portion of the commitment fee."  (First Koep Decl., Ex. A at 5 (emphasis added).)  Jalin's obligation to return the paid commitment fee does not depend upon Brightway fulfilling its purported role in the transaction.[8]

---

[7] Jalin argues that the Brightway story may be admitted despite these impediments for two reasons.  First, Jalin relies on Fed. R. Evid. 106, the "rule of completeness," which states that "[i]f a party introduces . . . part of a writing or recorded statement, an adverse party may require the introduction . . . of any other part . . . that in fairness ought to be considered at the same time."  The rule of completeness does not apply because "the rule is limited to writings and recorded statements and does not apply to conversations."  Fed. R. Evid. 106 advisory committee's note.  Jalin apparently offers evidence of an additional verbal agreement the parties made and does not offer additional writings or recorded statements.  Second, Jalin obliquely attempts to rely on Fed. R. Evid. 608, and asserts that ABW "opened the door to Ride Ocean Zoom and allowed the impeachment evidence to come in."  (Pl.'s Memo in Opp'n to ABW's Mot. For Summ. J. at 2 n.1 & 19 n.5, June 20, 2012, Docket No. 82.)  Jalin's argument is woefully unsupported and undeveloped.  The Court will not disregard the Magistrate Judge's discovery sanction and allow Jalin to introduce a new story involving a new entity because ABW made a reference to Ride Ocean Zoom, who appears in the written terms of the Commitment Agreement.

[8] Neither party refers to the parol evidence rule, but it presents yet another reason that Jalin's evidence about Brightway does not protect Jalin.  The Commitment Agreement explicitly "supersedes all previous communications and correspondence," (First Koep Decl., Ex. A at 1), and the Brightway story contradicts the terms of the written agreement.

Thus, the Court will not entertain Jalin's evidence about Brightway. However, even if the Court overlooked the Magistrate Judge's discovery sanction and Jalin's failure to disclose the evidence, the outcome would be the same for the reason just explained.

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II. JALIN'S CLAIMS RELATING TO ABW'S WEBSITE

#### A. Cybersquatting

Congress enacted the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), ("the ACPA") in 1999 to protect trademark owners against cybersquatting – "the practice of registering 'well-known brand names as Internet domain names' in order to force the rightful owners of the marks 'to pay for the right to engage in electronic commerce under their own brand name.'" *Virtual Works, Inc. v. Volkswagen of Am.,*

*Inc.*, 238 F.3d 264, 267 (4th Cir. 2001) (quoting S. Rep. No. 106-140, at 5 (1999)). To prevail on a cybersquatting claim, Jalin must establish three elements: (1) that Jalin's mark is distinctive or famous; (2) that ABW's domain name is identical or confusingly similar to Jalin's mark; and (3) that ABW used, registered, or trafficked in the domain name with a bad faith intent to profit from the sale of the domain name. *See Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1123 (D. Minn. 2000); *see also* 15 U.S.C. § 1125(d)(1)(A).

Jalin's claim fails because Jalin has presented no evidence that would allow a reasonable jury to conclude that ABW acted with a "bad faith intent to profit." 15 U.S.C. § 1125(d)(1)(A)(i). ABW alleges that it registered the domain name "jrca.info" and maintained the website in a legitimate, good faith attempt to warn other consumers about what it believed were Jalin's fraudulent business practices. Jalin contends that ABW knew that it was posting incomplete, inaccurate information, but Jalin offers no evidence suggesting that ABW intended to profit by creating the website. Jalin does not allege that ABW offered to sell the domain name to Jalin or anyone else, nor does Jalin allege that ABW offered to take down the website in exchange for money. *See PETA v. Doughney*, 263 F.3d 359, 368 (4th Cir. 2001) (upholding ACPA liability because defendant had publicly asked plaintiff to "settle" with him and "make him an offer" for the domain names). Unlike a classic cybersquatter, ABW registered only one domain name and used it to warn consumers about its experience with Jalin, not to extract money from Jalin. *See Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004) (affirming summary judgment in favor of a defendant when she only registered one site

and her actions were "undertaken in the spirit of informing fellow consumers about the practices of a . . . company that she believed had performed inferior work"); *Toronto-Dominion Bank v. Karpachev*, 188 F. Supp. 2d 110, 111 (D. Mass. 2002) (finding defendant liable under the ACPA where defendant registered sixteen domain names "as part of an extortionate campaign").

Because the record is devoid of evidence that ABW intended to profit from its website, the Court does not need to address each of the nine factors in the non-exhaustive list that courts may consider, even though some of them arguably cut in favor of finding bad faith.[9] *See Lucas Nursery*, 359 F.3d at 811 ("[I]t is not clear to this Court that the

---

[9] The nine factors enumerated in 15 U.S.C. § 1125(d)(1)(B)(i) are:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(Footnote continued on next page.)

presence of simply one factor that indicates a bad faith intent to profit, without more, can satisfy an imposition of liability within the meaning of the ACPA. . . .  The factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit.").  Even viewing the facts in the light most favorable to Jalin, the Court finds that no reasonable jury could conclude that ABW had a "bad faith intent to profit."  Therefore, the Court will grant ABW's motion for summary judgment on Jalin's ACPA claim (Count I) and dismiss the claim with prejudice.

### B.  Common Law Trademark Infringement

Jalin has not claimed that it possesses any registered trademarks, so it must rely on the common law of trademarks.  *See First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1044 (8th Cir. 1996).  To prevail on a common law trademark infringement claim, a plaintiff must show that: (1) it has a protectable mark; (2) it has priority of use of that

_____

(Footnote continued.)

> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
>
> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

There is also a "safe harbor" provision that precludes a finding of bad faith "in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."  15 U.S.C. § 1125(d)(1)(B)(ii).

mark; (3) defendant's subsequent use of that mark is likely to cause confusion; and (4) the court's exercise of equitable power is appropriate. *See id.* A protectable common law trademark "arises from the adoption and actual use" of the mark "to identify goods or services with a particular party." *Id.*

As an initial matter, it is not clear from Jalin's complaint whether its claim is based on the purported mark "JRCA" or on the purported mark "Jalin Realty Capital Advisors."[10] Throughout this action, ABW has seemed to assume that Jalin's claim is based on the purported mark "JRCA," which ABW used in its domain name "jrca.info." All of ABW's arguments in its brief focus on the purported mark "JRCA," not "Jalin Realty Capital Advisors," and Jalin's brief does not offer correction, clarification, or even counterargument.[11] Nonetheless, at oral argument Jalin's counsel asserted that its claims were based on the purported mark "Jalin Realty Capital Advisors." Counsel's failure to address this issue in Jalin's brief and alert ABW that ABW may have misunderstood Jalin's claim is puzzling and frustrating. That being said, the Court finds that Jalin's

---

[10] Jalin's complaint provided that "JRCA also claims common law trademark right of its name which has been used extensively and prominently in interstate commerce." (Compl. ¶ 16.) ABW's answer asserted that the complaint "is misleading or ambiguous to the extent it fails to identify or define Plaintiff's alleged 'name' for which Plaintiff is alleging trademark rights." (Def.'s Am. Answer, Affirmative Defenses, and Counterclaims ¶ 16, Apr. 8, 2011, Docket No. 8.) The complaint also refers to ABW's use of Jalin's "name and domain name that incorporates and is identical or confusingly similar to [Jalin]'s name." (Compl. ¶ 74.)

[11] Jalin incorrectly stated that ABW had failed to make an argument regarding its common law trademark infringement claim, which Jalin titled "false designation of origin, false description, and false representation in connection with the Plaintiff's name."

claim fails regardless of whether it is based on "JRCA" or "Jalin Realty Capital Advisors," but the Court must analyze the two purported marks independently.

If Jalin's claim is based on the purported mark "JRCA," it fails as a matter of law because Jalin has not produced any evidence showing that it has used the mark "JRCA" in connection with its services or that "JRCA" identified Jalin as the provider of its services in the minds of consumers. *See First Bank*, 84 F.3d at 1044. ABW asked Jalin to "[i]dentify any and all alleged uses in commerce of Jalin's purported 'JRCA' trademark" and Jalin responded with the frivolous objection that the interrogatory was "incomprehensible as drafted and overly broad." (Dungan Decl. Ex G at 47.) ABW also asked Jalin to provide "[a]ll documents relating to any and all alleged uses in commerce of Jalin's purported 'JRCA' trademark" and Jalin responded by referring ABW to Jalin's website. (*Id*., Ex. G at 36.) ABW provided a screenshot of Jalin's website and the website does not use "JRCA" to identify Jalin. (*See* First Koep Decl., Ex. F.) Because there is no evidence that Jalin ever used the mark "JRCA," that mark cannot form the basis of Jalin's common law trademark infringement claim. *See Chisum LLC v. Chief Auto. Sys., Inc.*, No. 01-816, 2001 WL 1640106, at *2 (D. Minn. Nov. 9, 2001) ("[T]hat mark is not yet being used on any product or in any promotional materials. Thus, [plaintiff] has not acquired a common-law trademark in the name.").

On the other hand, if Jalin's claim is based on the purported mark "Jalin Realty Capital Advisors," it fails for different reasons. Because the parties make no arguments regarding whether Jalin had a protectable interest in the mark "Jalin Realty Capital

Advisors,"[12] the Court will bypass that element and rest its decision on the lack of a likelihood of confusion. A party alleging trademark infringement must demonstrate that the defendant's use of the mark "creates a likelihood of confusion, deception, or mistake on the part of an appreciable number of ordinary purchasers as to an association between" the plaintiff and the defendant. *See Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987); *see also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:6 (4th ed. 1998) (stating that likelihood of confusion encompasses "confusion of source; confusion of sponsorship; confusion of affiliation; or confusion of connection"). The Eighth Circuit commonly considers the following six factors to determine whether such a likelihood of confusion exists:

> (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to 'pass off' its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase.

*Frosty Treats, Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1008 (8th Cir. 2005) (internal quotations marks omitted).

Here, the Court finds that there is no likelihood of confusion as a matter of law. It is implausible that consumers would somehow conclude that ABW's website was affiliated with Jalin, created by Jalin, or sponsored by Jalin. ABW's website does not offer products that compete with Jalin's products; in fact, it offers no products at all. It

---

[12] Such arguments would have involved the extent to which Jalin has used the mark and whether the mark should be classified as generic, descriptive, suggestive, or arbitrary. *See Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987).

would be immediately apparent to any reasonable consumer visiting ABW's website that its purpose was to criticize Jalin and warn consumers about what ABW perceived to be Jalin's fraudulent business practices.[13]  Jalin has not produced evidence of incidents of actual confusion and the Court is not persuaded that there is any likelihood that consumers visiting ABW's website would be confused as to an association between Jalin and ABW.[14]

Granting summary judgment in ABW's favor is consistent with the overwhelming weight of authority, which holds that it does not constitute trademark infringement when a consumer creates a website to express his or her views about a company's goods or services.  *See, e.g.*, *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045 (10th Cir. 2008); *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005); *Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108 (D. Minn. 2000). "[T]rademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *Mattel, Inc. v. MCA*

---

[13] The screenshot ABW provided includes a disclaimer saying "This site is NOT Associated with Jalin Realty Capital Advisors LLC," (First Koep Decl., Ex. F), but Jalin alleges that ABW added the disclaimer after this action began.  The Court would find no likelihood of confusion whether or not the website featured the disclaimer.

[14] Jalin did not raise the doctrine of "initial interest confusion," which permits a finding of likelihood of confusion when a "consumer is only initially confused and quickly becomes aware of the source's actual identity." *See Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1119-20 (D. Minn. 2000).  Had Jalin argued for initial interest confusion it would likely have been to no avail because ABW did not have commercial or financial incentives for creating initial interest confusion. *See id.*

Because the Court finds that there is no likelihood of confusion, the Court does not need to address ABW's affirmative defenses, which include First Amendment arguments and "fair use" arguments.

*Records, Inc.*, 296 F.3d 894, 900 (9ᵗʰ Cir. 2002) (internal quotation marks omitted). Therefore, the Court will grant ABW's motion for summary judgment on Jalin's common law trademark infringement claim (Count II) and dismiss the claim with prejudice.

### C.    Trade Dress Infringement[15]

There are two requirements before a "trade dress" is eligible for protection: "(1) the trade dress is primarily nonfunctional; [and] (2) the trade dress is inherently distinctive or has acquired distinctiveness through secondary meaning." *Rainforest Cafe, Inc. v. Amazon, Inc.*, 86 F. Supp. 2d 886, 893 (D. Minn. 1999) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992)).  Once these two elements are established, the plaintiff must also establish that the allegedly infringing trade dress "creates a likelihood of confusion in consumers' minds as to the origin of the services." *Id.*  Jalin's trade dress claim fails on multiple grounds.

First, Jalin's description of its purported trade dress is inadequate.  Jalin offered the following description in support of its claims:

> JRCA employs a distinctive trade dress in the design and layout of its website including its unique color motif that is consistent with its other print and on-line marketing materials and that is recognized and associated with JRCA by JRCA's clients and potential clients.  JRCA claims common law trade dress rights in the appearance of its website, www.jalinrca.com.

---

[15] Jalin brings two independent trade dress infringement claims, one entitled "false designation of origin, false description, and false representation in connection with the Plaintiff's trade dress," (Count III), and another entitled "common law trade dress infringement," (Count VI).  Jalin has not made separate arguments in support of the two claims and the Court has found no authority suggesting that the analysis differs depending on whether the claim is brought under the Lanham Act or state common law.  Therefore, the Court's analysis in this section is applicable to both claims.

(Compl. ¶ 22.)  ABW asked Jalin to identify the elements of its claimed trade dress and Jalin asserted that it had set forth "[e]ach and every element" of its trade dress in the complaint.  (Dungan Decl. Ex. G at 46.)  ABW also asked Jalin to describe any possible basis for the contention that Jalin's alleged trade dress had acquired secondary meaning and Jalin, true to form, objected to the interrogatory as "incomprehensible as drafted and overly broad."  (*Id.*)

"To recover for trade-dress infringement under § 43(a) of the Lanham Act, a party must first identify what particular elements or attributes comprise the protectable trade dress."  *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 768 (6th Cir. 2005).  "'[I]t will not do to solely identify in litigation a combination as 'the trade dress.'  Rather, the discrete elements which make up that combination should be separated out and identified in a list.'"  *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 634 (6th Cir. 2002) (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:3 (4th ed. 1998)).

Here, Jalin has not explained what elements make its website distinctive and worthy of protection.  It has simply asserted that its website is "distinctive" and has a "unique color motif."  Jalin asserted that the website was consistent with Jalin's advertising materials, but it did not provide any of those materials in response to interrogatories and it is now barred from doing so by the Magistrate Judge's sanctions. Jalin's vague reference to the website's "design and layout" and "color motif" do not provide a sufficient basis for a reasonable jury to conclude that the trade dress is inherently distinctive or that it has acquired secondary meaning.

Further, even if Jalin had satisfied the first two elements, no reasonable jury could find that ABW's website creates a likelihood of confusion. Not only was the content of ABW's website sufficient to alleviate any risk of confusion, but also the two websites had very different color schemes and layouts. (*See* First Koep Decl., Ex. F.) For these reasons, the Court will grant ABW's motion for summary judgment on Jalin's trade dress infringement claims (Counts III and VI) and dismiss the claims with prejudice.

### D. Deceptive Trade Practices

The Uniform Deceptive Trade Practices Act, ("the DTPA"), codified at Minn. Stat. § 325D.44, prohibits a variety of misleading commercial practices that are very similar to those practices prohibited under federal law by the Lanham Act. *See Woodroast Sys., Inc. v. Rests. Unlimited, Inc.*, 793 F. Supp. 906, 916-17 (D. Minn. 1992). Jalin alleges that ABW ran afoul of two of the DTPA's prohibitions, Minn. Stat. § 325D.44, subd. 1(2), (3). (Compl. ¶ 88.) In relevant part, the statute provides for liability when a person, "in the course of business, vocation, or occupation . . . (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services" or "(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another."[16]

---

[16] Jalin did not allege that ABW violated Minn. Stat. § 325D.44, subd. 1(8), which applies when a person "disparages the goods, services, or business of another by false or misleading representation of fact." Had Jalin made such an allegation, it would likely have failed because Jalin provided no evidence that ABW acted "in the course of business, vocation, or occupation" when it created its website to warn consumers about Jalin. *See* Minn. Stat.

(Footnote continued on next page.)

The Court has already found that no reasonable jury could conclude that ABW's website causes a likelihood of confusion. No consumer confronting ABW's website, which criticizes Jalin and warns consumers about Jalin, would be confused into thinking that Jalin sponsored, approved, or certified the website, or that Jalin was affiliated, connected, or associated with the website. Therefore, the Court will grant ABW's motion for summary judgment on Jalin's DTPA claim (Count IV) and dismiss the claim with prejudice.

### E.  Appropriation of Personal Name and Likeness

Jalin's appropriation of personal name and likeness claim is based on the Restatement (Second) of Torts § 652C (1977), which was adopted by the Minnesota Supreme Court in *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233, 235 (Minn. 1998), and provides that "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." Jalin contends that ABW appropriated Jalin's name for its own use and benefit when ABW used Jalin's initials in the domain name of its complaint website.

Due to its recent adoption, the tort of appropriation is undeveloped in Minnesota. Whether an appropriation claim is cognizable on the facts of the present case is a question of first impression in Minnesota. The Court's role is to predict how the

_____
(Footnote continued.)

§ 325D.44, subd. 1. This threshold requirement was not discussed by either party and it applies to Jalin's claims under subd. 1(2) and (3) of the DTPA as well.

Minnesota Supreme Court would resolve the unanswered question of state law. *See Spine Imaging MRI, L.L.C. v. Country Cas. Ins. Co.*, Civ. No. 10-480, 2011 WL 379100, at *6 (D. Minn. Feb. 1, 2011) (citing *Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 387 F.3d 705, 715 (8th Cir. 2004)).[17]

The appropriation tort protects the "privacy and solicitude of private personae from the mental distress that accompanies undesired publicity." *Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 730 (8th Cir. 1995). No Minnesota court has previously allowed a commercial entity, as opposed to a human being, to bring an appropriation claim and allowing Jalin to bring an appropriation claim would make Minnesota a major outlier. *See* J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 4:43 (2d ed. 2000) ("Because the right of privacy directly involves injury to human dignity and feelings, the clear majority view is that nonhumans, such as corporations, possess no right to privacy as such.").

Further, it is not clear that allowing an appropriation claim in this context would serve any purpose that is not already served by Jalin's other causes of action, such as trademark infringement and defamation. *See Johnson v. Paynesville Farmers Union Coop. Oil Co.*, 817 N.W.2d 693, 704 (Minn. 2012) (declining to expand a cause of action where "other causes of action . . . provide remedies for the type of behavior at issue").

---

[17] Jalin suggests that the Court should certify the question to the Minnesota Supreme Court, while ABW suggests that the Court must reject Jalin's claim because it has not previously been recognized by a Minnesota court. Neither party recognizes the role of a federal court sitting in diversity jurisdiction to predict how the state court would resolve an unanswered question of state law.

This Court sees no reason to predict that a Minnesota court would take the seemingly unprecedented step of allowing Jalin, a commercial entity, to pursue its appropriation claim. Therefore, the Court will grant ABW's motion for summary judgment on Jalin's appropriation claim (Count V) and dismiss the claim with prejudice.

### F.    Intentional Interference with Economic Relations

Minnesota law recognizes two separate torts relating to interference with economic relations: (1) interference with an existing contract and (2) interference with a prospective business relation. *See Hern v. Bankers Life Cas. Co.*, 133 F. Supp. 2d 1130, 1137 (D. Minn. 2001). It is not perfectly clear which claim Jalin intends to make, but either would fail.

The elements of interference with an **existing** contract are "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994) (internal quotation marks omitted). The elements of interference with a **prospective** business relation are:

1.   the existence of a reasonable expectation of economic advantage or benefit belonging to Plaintiff;

2.   that Defendants had knowledge of that expectation of economic advantage;

3.   that Defendants wrongfully and without justification interfered with Plaintiff's reasonable expectation of economic advantage or benefit;

4.   that in the absence of the wrongful act of Defendants, it is reasonably probable that Plaintiff would have realized his economic advantage or benefit; and

5.   that Plaintiff sustained damages as a result of this activity.

*Lamminen v. City of Cloquet*, 987 F. Supp. 723, 731 (D. Minn. 1997) (citing *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632-33 (Minn. 1982)). Damages for interference with a prospective business relation may not be "remote, conjectural, or speculative." *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1506 (8th Cir. 1992) (internal quotation marks omitted). Jalin is required to provide evidence of specific prospective relations that have been impacted, not merely assert that it lost unspecified business opportunities. *See H Enters. Int'l, Inc. v. Gen. Elec. Capital Corp.*, 833 F. Supp. 1405, 1417 (D. Minn. 1993) (citing *Witte Transp. Co. v. Murphy Motor Freight Lines, Inc.*, 193 N.W.2d 148, 151 (Minn. 1971)).

Jalin's allegations are woefully vague and Jalin offers no supporting evidence. Jalin asserts that it "had economic relationship [sic] between itself and many of its clients that are seeking loans," (Compl. ¶ 103), and that "[a]s a further direct and proximate result of the Defendant's actions and/or omissions, there was actual disruption of Plaintiff's economic relationship with its clients." (*Id.* ¶ 109.) When asked to identify "each 'economic relationship' between yourself and your clients or potential clients that you contend was 'disrupted' by ABW," Jalin stated that it "intends to hire expert [sic] in the field to properly quantify the damages to the Plaintiff's 'economic relations' as a result of the Defendant creating an impostor website to defame and destroy the Plaintiff's business." (Dungan Decl., Ex. G at 49.) Jalin apparently never hired an expert and Jalin has still not identified an existing contract or a specific prospective relation that was disrupted.

On the basis of this evidence (or lack thereof), a jury could not reasonably conclude that ABW intentionally procured the breach of an existing contract. A jury also could not reasonably conclude that Jalin had a "reasonable expectation of economic advantages," necessary to support a claim of interference with a prospective business relation. Jalin's response to ABW's motion for summary judgment focuses on the alleged untruthfulness of the information on ABW's website, but makes no attempt to bolster its allegations with evidence of specific contracts, existing or prospective, that were lost as a result of ABW's website. Given the complete lack of evidence, Jalin's claim borders on frivolousness. Therefore, the Court will grant ABW's motion for summary judgment on Jalin's intentional interference with economic relations claim (Count VII) and dismiss the claim with prejudice.

### G. Defamation

Defamation has four elements under Minnesota law: (1) a false statement; (2) communication of the false statement to someone other than the plaintiff; (3) the false statement would tend to harm the plaintiff's reputation or lower his or her estimation in the community; and (4) the recipient of the false statement reasonably understands it to refer to a specific individual. *See State v. Crawley*, 819 N.W.2d 94, 104 (Minn. 2012). "Truth . . . is a complete defense, and true statements, however disparaging, are not actionable." *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980).

Federal courts hold that defamation claims should be pled with specificity because "'knowledge of the exact language used is necessary to form responsive pleadings.'" *Bauer v. Ford Motor Credit Co.*, No. Civ. 00-389, 2000 WL 34494820, at *3 (D. Minn.

June 27, 2000) (quoting *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 699 (8ᵗʰ Cir. 1979)).

Similarly, "Minnesota law has generally required that in defamation suits, the defamatory

matter be set out verbatim." *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321,

326 (Minn. 2000).

Even if the Court were to require something less than verbatim reproduction of the

allegedly defamatory statements, Jalin's defamation claim would fail. The most specific

description of the allegedly defamatory statements is Jalin's reference to "false

accusations of business misconducts." (Compl. ¶ 115.) Elsewhere in the complaint, Jalin

refers vaguely and generically to "false," "malicious," "defamatory," and "derogatory"

information and statements. (*See, e.g.*, Compl. ¶¶ 3, 21, 36-40, 42.) At best, these are

general descriptions of the allegedly defamatory statements, and at worst, they are

completely nondescript. Either way, Jalin's allegations are insufficient.

Jalin does not argue that there is any reason for the Court to relax the typical

requirement that defamation be pleaded with specificity.[18] Jalin also has not moved to

amend its complaint. Further, allowing Jalin to amend its complaint to specifically

present the allegedly defamatory statements would conflict with the Magistrate Judge's

sanction prohibiting Jalin from relying on information that was not provided in its

---

[18] During discovery ABW asked Jalin to "[i]dentify each and every allegedly false statement" and Jalin responded that "[t]hese [sic] information are contained in the impostor website that was created by the Defendant, which the Defendant pulled down when confronted with this lawsuit. Plaintiff is conducting a search to see if it can retrieve the back pages of the impostor website that was created by the Defendant." (Dungan Decl., Ex. G at 49.) If Jalin believed that some unique aspect of the present case prevented it from satisfying the pleading requirements, it should have presented such an argument to the Court.

discovery responses. Therefore, the Court will grant ABW's motion for summary judgment on Jalin's defamation claim (Count VIII) and dismiss the claim with prejudice.

## III.    ABW'S COUNTERCLAIMS RELATING TO THE LOAN TRANSACTION

### A.    Breach of Contract

Under Minnesota law, "[a] claim of breach of contract requires proof of three elements: (1) the formation of a contract, (2) the performance of conditions precedent by the plaintiff, and (3) the breach of the contract by the defendant." *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. App. 2008) (citing *Briggs Transp. Co. v. Ranzenberger*, 217 N.W.2d 198, 200 (Minn. 1974)). The first element, formation of a contract, requires (1) an offer, (2) acceptance, and (3) consideration. *Id.*

As noted above, the Commitment Agreement embodied Jalin's "commitment to provide financing" and stated that Jalin "intends to bring co-lenders to facilitate this loan" and would "manage all aspects of the co-lending." The Agreement required ABW to pay a "commitment fee" of $37,500 for "processing, underwriting, and due diligence." The Agreement stated that ABW was "entitled to a refund less any cost incurred if [Jalin] does not fund a loan under the terms stated." And the Agreement provided that "[i]f [Jalin] is unable to bring co-lenders into the transaction, or if [Jalin] does not perform its obligations under the terms of this commitment for whatever reason, [Jalin] shall only be obligated to refund the paid portion of the commitment fee."

Jalin does not deny that the parties entered into the written Commitment Agreement; Jalin acknowledges that it received ABW's commitment fee from Ride

Ocean Zoom, as the Agreement specified; Jalin does not deny that it failed to find co-lenders or fund a loan; Jalin does not deny that ABW requested a refund of the commitment fee; and Jalin does not purport to have provided a refund. Based on these undisputed facts, a reasonable jury would have to conclude that Jalin is liable to ABW for breach of contract.

Jalin has told two very different stories during the course of this action and neither helps it avoid summary judgment on ABW's breach of contract claim. First, in Jalin's complaint, its story was that ABW had applied for a loan and Jalin's representatives made a business decision not to loan money to ABW. (*See* Compl. ¶ 20.) During discovery, ABW asked Jalin to identify "each and every task or matter undertaken . . . that you contend entitles you to a commitment fee from ABW." Jalin responded that "Defendant applied for a loan which was later not approved" and also referred ABW to the facts that Jalin narrated in its complaint. (*See* Dungan Decl., Ex. G at 48.) Even if Jalin's assertions that it made a business decision to decline ABW's loan request is true, Jalin is not freed from its contractual obligation to refund the commitment fee, which it acknowledges that it received.

Jalin's second story – the Brightway story – came to light in its brief and supporting declaration in response to ABW's motion for summary judgment. As the Court explained in greater detail above, there are a number of reasons why the Brightway story cannot protect Jalin at this point. First, the information is barred by the Magistrate Judge's sanction prohibiting Jalin from relying on any information it did not provide in response to ABW's discovery requests. Second, Jalin did not disclose Brightway or any

of its representatives in its Rule 26(a)(1) initial disclosures. Third, even if the Court overlooked these flaws and considered the evidence, Jalin was obligated to refund the commitment fee if it did not perform for whatever reason. The Commitment Agreement also explicitly "supersedes all previous communications and correspondence." Therefore, Jalin cannot avoid liability under the Commitment Agreement by alleging that the parties reached an unwritten understanding about Brightway's role in the transaction prior to entering into the Commitment Agreement.

Based on the existence of the Commitment Agreement, Jalin's acknowledgement that it received ABW's commitment fee, and ABW's unrefuted allegation that Jalin has not provided a loan or refunded the commitment fee, the only reasonable conclusion a jury could draw is that Jalin is liable to ABW for breach of contract. Therefore, the Court will grant ABW's motion for summary judgment on its breach of contract counterclaim.

### B.    Fraud

The elements of fraud are:

(1) [T]here was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

*Hoyt Props., Inc. v. Prod. Res. Grp, L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007) (quoting *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986)). Further, the complaining party must establish that its reliance was reasonable. *Id.* at 320-21.

According to ABW, Jalin falsely represented on its website and in the Commitment Agreement that it was capable of providing a substantial loan and that it would make a good faith endeavor to do so. ABW alleges that Jalin made these representations to induce ABW to provide a commitment fee, that Jalin never intended to provide a loan, and that Jalin's representatives did not even possess the necessary licensure to provide the loan they agreed to provide. Jalin's primary response is that even if its statements were false, which it does not concede, its purported business was providing real estate loans, the website advertised solely real estate loans, and its statements therefore could not have induced ABW to enter into the Commitment Agreement because ABW was seeking a business loan, not a real estate loan.

The Court finds that genuine issues of material fact remain regarding ABW's fraud claim even though Jalin is prohibited from relying on information that it did not provide in response to ABW's discovery requests. For one, the jury could reasonably conclude that ABW's reliance on Jalin's purported ability to provide a substantial loan was unreasonable. Therefore, the Court will deny ABW's motion for summary judgment on its fraud counterclaim.

This case will be placed on the Court's next available trial calendar. ABW's fraud and damages claim will be tried.

# ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that: ABW's Motion for Summary Judgment [Docket No. 77] is **GRANTED in part** and **DENIED in part**, as follows:

1.    The motion is **GRANTED** as to all of Jalin's claims.  Counts I–VIII of Jalin's complaint [Docket No. 1] are **DISMISSED with prejudice**.

2.    The motion is **GRANTED** as to ABW's counterclaim for breach of contract.

3.    The motion is **DENIED** as to ABW's counterclaim for fraud.

DATED:  January 8, 2013                _____ s/ John R. Tunheim _____
at Minneapolis, Minnesota.                JOHN R. TUNHEIM
                                       United States District Judge